morning. Really, I think our brief covers everything that I want to say, and I really don't have anything to add to the brief, other than the fact that perhaps, you know, if the court is inclined to reverse the summary judgment and remand it, that the case be reassigned to a different court, because this particular court was extensively involved in participating in settlement and actively involved with the settlement after the summary judgment motion had been granted. After he granted the summary judgment motion, he called the parties in and ordered another settlement conference. But for a court to order something to be reassigned, what does the court have to find? I haven't really gone through... I mean, essentially, you're finding that the judge would be prejudiced in hearing that matter. Or biased. Correct. And, you know, there may be other issues if the matter were sent back, where someone could bring a motion to say why that person wouldn't hear it. But at this level, we're not, you know, we don't know what's happened. Right. You know, we don't know what information that that court may have. I mean, essentially, when... I mean, courts very rarely do that. But when it does happen, a lot of times it happens because the court won't follow what the court of appeals is saying or that there are issues and, you know, or there's something manifestly in the record. But, you know, what do we have in this record that other than... I mean, you obviously don't agree with the summary judgment being granted. But what in the record would indicate that this court, that court would be biased? Well, I believe that the record does demonstrate that the court has a predisposition to try to resolve this case outside of it going to a jury. The court did indulge itself in making findings of fact and weighing credibility of different matters. And so we're concerned about that, whether or not we would get, you know, through jury instructions or some other vehicle of taking away to some decision-making by a finder of fact. I mean, the court went ahead and found... went ahead and basically... Well, on the probable cause finding, it would seem to me that there's certain... There's obviously some facts that are in dispute. But in terms of those that are not disputed, Mr. Watson had been drinking. Mr. Watson was out in, what, 2-8, you know, in the early morning hours, walking around. It's undisputed that he had gotten in... He disputes whether he tried to get into the patrol vehicle, but it's undisputed that he got into some other vehicle and then became concerned for his safety and jumped out of there. It's undisputed that someone called Mr. Perez came over and identified him as being the driver of this vehicle that he... albeit wrong, you know. So why, on those undisputed facts, wouldn't there be probable cause to arrest Mr. Watson? I mean, it turned out, yes, he wasn't involved in that accident. But in the probable cause determination, we have to look at what we have there. And it's not disputed that Mr. Perez identified him and that Mr. Watson had been drinking. Well, the thing is that that identification was tainted in any event. Mr. Perez was told that he confessed, and then there's a whole conflict. But what evidence is there in the record? Mr. Perez was not deposed, so we don't have his deposition in the record. Am I correct on that? That's correct. Okay. So, and it's not disputed that he did, in fact, identify him. But the whole context of how he was identified, there's no... All right, what evidence is there? There's no evidence in the record that, you know, Mr. Watson might think certain things occurred, but what evidence is there in the record? If Mr. Perez had been deposed and he said, oh, well, such and such an officer told me that I should just go over there and identify whoever we put out, there's no evidence as to how that was conducted, anything along those lines, or that it was, in fact, tainted. I mean, specifically, you didn't depose Mr. Perez. So I think we have to take that as it is. Well, except we do have a problem, the fact that Mr. Perez, on the citizen's arrest, that Mr. Perez's arresting officer forged his signature. Okay. Did Mr. Perez testify to that, that that's not my signature? I believe that there was a, I don't know if it's in testimony because he wasn't deposed, but I know that there was tape recordings or... I want what's in the record that says that that signature's forged. Right. By the way, I forgot to mention earlier on that I would like to reserve some time for probably... Well, Counselor, you've indicated you'd like to rest on your briefs, and you've answered these questions. Right. Well, right. You've answered these questions. Maybe we ought to hear from the other side. Right. But, no, I could answer the question that Officer Hill did admit, and there's testimony from Officer Hill that he did forge Mr. Perez's signature on the report. His testimony was I forged it, or his testimony was I talked to Mr. Perez and Mr. Perez said he wanted to put him under citizen's arrest and told me, gave me permission to sign it, right? That, well, right, he gave him permission, but he signed his, he signed his, right, he signed his name. Okay. So the evidence is that he signed his name. Correct. Okay. Thank you. All right. Counsel, why don't we let the city respond, and then you still have command of your time, but... Okay. All right. I appreciate it. Thank you very much. Sure. We'll hear from the city, or the county, I should say, huh? Good morning, Your Honors. May it please the Court. Raymond J. Fuentes for the County Defendants. Specifically, Your Honors, Deputy Heal did get permission from Mr. Perez to sign the citizen's arrest form, and he explained it extensively in his deposition. Mr. Perez lived in Hemet, which is quite a distance from the West Hollywood area, and it is very clear that Mr. Perez also identified Mr. Watson at the UCLA area. We have testimony by Officer Luther, by Mr. Carter, I guess he's Officer Carter, and also by Deputy Heal. It's very, very clear that that's what happened. Deputy, and I can go through the facts, it's recited, but I do need to at least address the court and advise the court that there may be some confusion in terms of the numerous people that were involved, but it's very, very clear that what we're dealing here is what was presented to Deputy Heal as an officer and how he had to respond to what was presented to him. The record is clear that he appeared in the West Hollywood area to investigate a traffic collision report. He did speak to Mr. Perez. Mr. Perez indicated what had happened. There was a rear-end accident. The gentleman had left. He also identified the gentleman, and they were getting facts. And during this portion of the investigation, there was a dispatch call from UCLA to the Sheriff's Department, and parts of that are reflected in the record. You can also see that Deputy Heal participates in some of the dispatch conversations that have taken place. Regardless, UCLA indicates that they do have an individual who was involved in an accident in the West Hollywood area and that they may very well have the individual who was involved in the accident with Mr. Perez. It is really clear in terms of the locations. They're not very far apart. It is clear that the dispatcher asked the UCLA dispatcher, Are you sure? Basically, he did not want to send an officer out to UCLA unless there was some reason to do so. There's got to be some reasonable suspicion connecting this gentleman with Mr. Watson, who, in fact, was stopped at UCLA before sending out a deputy. And it was clear, yes, he was involved in a traffic collision. Well, what's the license plate of the vehicle that was involved in the accident? The license plate number was given by Deputy Heal to the dispatcher, then provided to the dispatcher at UCLA, and the indication was, yes, that's the guy. That's the guy we have. Well, if Watson had never told Officer Carter or any UCLA officer that he was in an accident in West Hollywood, would Officer Luther contacting the Sheriff's Department have been a violation of Watson's constitutional rights? Maybe not, Your Honor. It was clear that Mr. Watson was intoxicated, no question about it. But there is a connection. I think that if you look at the record, it is clear that Mr. Watson did indicate that he was involved in an accident, although denies in his deposition. But he did tell Officers Luther, Gorastiza, and Carter to get involved in a prior accident. And how do we know that? If you listen to the – well, if you see the dispatch tapes and you've seen the transcripts, if you listen to them, it's even clearer. But you can see the transcripts where the ADT Bel Air transcript dispatcher calls the Sheriff's Department, indicates that they have a gentleman who'd been involved in an accident in West Hollywood. Same thing for UCLA. They had been told that Mr. Watson was involved in an accident, and it turns out he was involved in an accident. Maybe not the hit-and-run accident that was being investigated, but clearly. Now, the problem we have is when this deputy is trying to decipher what Mr. Watson is saying, he is intoxicated, and he's trying to get information from him. If you look at the – for example, the transcript of Mr. Watson's discussion with Deputy Heal, he'll say he never knew – he did not know how he ended up at UCLA. He didn't know how he got out there. Later on, we found out, well, it hit two bars, the last one being where he got a voucher, ended up in the other side of town. By the way, he lived two blocks from the bar where he had the voucher. Two blocks away. He could have walked. He could have crawled home. He just couldn't do it. But the point is, this information is information presented to Deputy Heal. He gets this information. Yes, after getting the information from UCLA, you're right. We don't know if it came from Officer Luther or someone else. The point is, we've got a man here that appears to be involved in your accident that you're investigating, and basically he went out to conduct a further investigation. And he brings the victim with him. And the victim identifies him. And the victim identifies him such that Officer Carter says that he heard it. Officer Luther heard it. Officer Osteaser heard it. And Officer Deputy Heal. So there's no question there's an ID. Now, it's an erroneous ID, it turns out, later, right? It does, Your Honor. But, I mean, the point is, when an officer has to act, it's the reasonable officer test that you must apply. What was presented to the officer to raise a reasonable suspicion, number one, to detain, and then probable cause to arrest. He's got all these facts that are presented to him, and he's got to act on them. Now, remember something else, too, that it's not just the citizen's arrest that we're dealing with here. Officer Deputy Heal was present while the field sobriety test was given. He gives him a breathalyzer. He's got independent facts to arrest Mr. Watson for a 647F, which is front and public. He's not able to take care of himself. So, in addition to that, I guess Mr. Watson, though, disputes some of the issues on the 647F. What are the undisputed facts regarding probable cause on the? In respect to the field sobriety test, Your Honor, that was being conducted by Officer Gorstiza, Mr. Watson could not pass any of those. Deputy Heal was present. That's undisputed. The other undisputed fact. Did Mr. Watson ever say that he did pass? Is that anywhere in the record? I don't think he did, Your Honor. He testified that he did take field sobriety tests. He felt that he, yes, in his own words, he had been drinking, but that he could still care for himself. I mean, that's his position. He doesn't deny he didn't drink. We know he had five drinks. We know that. And we know he was at the factory bar between 8 o'clock and 1 o'clock in the morning. We know that, too, based on his testimony to the deposition. We know that he went to the revolver bar to get a ride home sometime after 1.15. Why? Because he talks to the owner there. And he knows a taxi is brought to drive him home. We know all of that. We know for sure that in the breathalyzer we have a 1.7 and 1.8, which is twice the legal limit in terms of being intoxicated and being impaired legally. For driving. The situation is, yes, he denies that he tried to get into the ADT, Bel Air vehicle. He denies that. But we have a call out from Sunset. That's where he is stopped by Officer Luther. So that information, most of that information is not in dispute. Also, in terms of Deputy Hill bringing Mr. Watson from UCLA over to West Hollywood, you have a two- or three-page transcript where you'll listen to the conversation going back and forth. If you listen to the tape, you can hear the slurred voice. You can hear that. But all you have is a transcript. But even the transcript tells you, I don't know how I got to UCLA. How did I get there? He didn't know. He's talking to the deputy. I think if someone is not intoxicated to that degree, you would know how you got someplace from point A to point B. He did not. All right, Counsel, do you want to add anything in terms of their briefing that needs to be said? Well, the forgery part in terms of the citizen's arrest before you address that. I covered that. And there's an issue that's been raised, which I need to address also, is that charges were filed against Mr. Watson. In fact, no charges were ever filed against Mr. Watson. As a result of the package conducted later by Investigator Kennessy, that no charges were ever filed by the District Attorney's Office. So I know that has been brought into brief. There's no evidence to it. When Mr. Watson tried to continue, there's nothing to continue because there was nothing there, nothing pending. And clearly, as a result of Investigator Kennessy's package to the District Attorney's Office, no charges were filed. And you know I need to reserve also for counsel from UCLA. We will hear from the UCLA. Thank you. Thank you. Good morning. Patrick Hurley for the UCLA defendants. I'm a little embarrassed. There's a case that we didn't cite that I think is important for the probable cause issue. That's the U.S. Supreme Court case of Devenpeck v. Alford, the 2004 case. And it reversed some prior rulings by this Court that the issue is really ---- You didn't provide a Rule 20HA letter? I didn't, Your Honor. And I thought about it, but my understanding was Rule 20HA was for things that came out after the briefing was done, and I apologize for that. Well, basically it's anything that you intend to rely on in oral argument so that the people of the case read it, be prepared. I understand that, Your Honor, and I apologize to the Court and to plaintiff's counsel, but I did want to raise the issue. All right, our rules also require that you provide a detailed description of the citation in three copies for the Court plus an additional copy for opposing counsel, and you should do that before you leave the room today.  Well, be sure to make extra copies so that our rules are complied with. Okay. And it's the ---- I think the Devenpeck decision also follows a decision by this Court, which was earlier in the Berry v. Fowler case, that talks about that the Fourth Amendment protects unreasonable seizures, and whether a seizure is unreasonable is whether it's supported by probable cause. And in this case, again, there was probable cause for an arrest for public intoxication. And, in fact, as to the UCLA defendants, they just conducted a detention, not an arrest. But to add to Mr. Fuentes, there's other undisputed facts that supported the 647F arrest, that Mr. Watson had slurred speech, watery and bloodshot eyes. This comes from the depositions of Officer Luther and Officer Gorstiza, and that's at page 349 of the record. He had an odor of alcohol, also at 349. He was altered as to time. During the field sobriety test, he thought it was midnight when it was actually 3 a.m. So that goes, that's at page 34 of the record. He was also disoriented and had an unsteady gait. That's at page 97 and page 349 of the record. So all of those things lead to a probable cause determination of 647F, based on the cases that we cited from California that indicate when probable cause is present. Anything further? No, Your Honor. That's all. Thank you. Thank you. We'll now hear from Mr. Levinson. You have some reserve time. Okay. First of all, in response to the drunken public, the trial court found that there were questions of fact, and it wasn't proper for a summary judgment on that. He was never arrested for that, for 647F. And so I think it's just really one big red herring in that regard. Wait a minute. Are you saying that the trial court denied summary judgment with respect to his being drunken? The court made a specific finding that that was a question of fact. Yes. We'll have to look at it. Go ahead, counsel. I might be able to, perhaps some of my colleagues might be able to look it up in the record, and we'll be able to get you a page. Okay. With respect to counsel had indicated that Watson had mentioned that he was in an accident, and he didn't make any disclosure of him being in an accident earlier that day until after he was arrested, not prior to him being arrested. Let me see. Okay. And anything further, counsel? Yeah, there is. There is. When Officer Hill, the arresting officer, took Mr. Watson, he had him in his patrol car, and he was tape recording him. He kept on turning on and off the tape recorder, so there was selected information that was being recorded on the tape recording from Officer Hill when he was with him in the vehicle. I believe that Officer Peacock was with him at the time. The other thing that we shouldn't forget about, though, is the following day after the accident, Mr. Watson, the actual perpetrator of the hit-and-run accident, admitted and basically he admitted that he's the one, the actual hit-and-run driver, yet Investigator Kennessy continued in pursuing this against Mr. Watson, didn't investigate, didn't go and do further interviews with Mr. Leal, who was the person who actually was the hit-and-run driver, and this entire event didn't really end until June. Six months later, when he was trying to deal with the DMV and getting it cleared with the DMV, they brought the case twice to the DA's office. The DA rejected it once, and then I believe that the DA presented it again to the DA. So for whatever reason, it was continuing to be pushed, and then it was reported to the DMV, and notwithstanding various assurances from Officer Kennessy to Mr. Watson that it would be dropped and that he would do whatever he could to try to clear it up, he never did anything about it, and Mr. Watson was in touch with Mr. Sterling. This is all in the brief. I don't know. You could stop me because I don't want to be reinterpreting what's already in there. Yes? It's not really my normal practice to interfere with counsel's presentation, but I think what you need to do, counsel, is focus on your final point. What do you want to leave with this court? What's your strongest argument? The strongest argument is that there are questions of fact. The court specifically found that there was a question of fact. The court went ahead and made determinations that essentially made a bench trial. The plaintiff didn't know that he was going to be having a bench trial and would have opposed it differently than for summary judgment. There is evidence that Mr. Watson left the West Hollywood area by taxicab with a voucher either at 12.30 or 1.30. In either scenario, he would have been out of that area well before the time of the accident, and none of the people that were investigating inquired as to the time that he was in custody. You have two officers who said that he was in custody. You have Officer Carter who said he was in custody at 1 o'clock. You have Officer Gorsiza who said that he saw Watson in custody at 2 o'clock in the morning. Either of those show take Watson out of West Hollywood at the accident scene at 2.20 or 2.10 when the accident occurred. I'm not guilty of that. I think that's for sure. Right. We know that now. Right. Of course we know that now. But we still have all the wrongful conduct that took place subsequent to the arrest, as well as Officer Hill. I mean, the dispatchers, if you read the transcripts or listen to the transcripts, you have an opportunity to. They couldn't imagine how this person Westwood could be the same guy. I think we're pretty well aware of your argument. This was all before the arrest. I think we're pretty well aware of your arguments in your brief, and we've gotten into quite a lot of the facts as well. So unless you have anything further. That's true. There was a description of the driver that they did get at the scene in West Hollywood prior to going out to Westwood, and Mr. Watson didn't fit the description. The only description is that it went over the radios. Well, I think this is the 17-year-old boy that you're talking about, and maybe the question is where in the record did you establish that Officer Grolstieser heard anything about a 17-year-old boy on his scanner? Well, actually, the 17-year-old boy was the description in Westwood of somebody that they saw in that area. But I'm just talking about I believe that they got a description of the perpetrators in West Hollywood from Mr. Perez. Okay, but that's before Mr. Perez came over and identified Mr. Watson, correct? Correct. And wearing a white shirt and I think it was either blue jeans or black pants or something like that. And there was a description with a gentleman with a goatee. And none of those descriptions fit Mr. Watson. All right. Thank you, Counsel. Thank you very much. We understand your argument. The case just argued will be submitted for decision, and the Court will adjourn. Thank you.
judges: Hall, O'scannlain, Callahan